UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA (FRESNO)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No. 1:25-cr-00017-JLT- |
| | . | SKO |
| Plaintiff, | . | |
| | . | |
| v. | . | |
| | . | |
| ANDREW ADLER, | . | 2500 Tulare Street |
| | . | Fresno, CA 93721 |
| Defendant. | . | |
| | . | Monday, June 2, 2025 |
| . . . . . . . . . . . . . . . | . | 8:02 a.m. |

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JENNIFER L. THURSTON
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:
U.S. Attorney's Office
By:  JOSEPH BARTON, ESQ.
     CODY S. CHAPPLE, ESQ.
2500 Tulare Street, Suite 4401
Fresno, CA 93721
(559) 497-4000

For the Defendant:
Illovsky Gates & Calia LLP
By:  EUGENE G. ILLOVSKY, ESQ.
     SHARON E. FRASE, ESQ.
1611 Telegraph Avenue, Suite 806
Oakland, CA 94612
(510) 394-5885

Audio Operator:         Courtroom ECRO Personnel

Transcription Company:  Access Transcripts, LLC
                        10110 Youngwood Lane
                        Fishers, IN 46048
                        (855) 873-2223
                        www.accesstranscripts.com

        Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1

1          (Proceedings commence at 8:02 a.m.)

2          THE BAILIFF:  The Court calls number one on calendar

3    United States v. Andrew Adler, Case Number 1:25-cr-17 scheduled

4    for sentencing.

5          THE COURT:  All right.  Good morning.  May I have the

6    appearances, please?

7          MR. BARTON:  Good morning, Your Honor.  Joe Barton

8    and Cody Chapple for the Government.

9          MR. ILLOVSKY:  Your Honor, good morning.  Eugene

10   Illovsky and Sharon Frase for Mr. Adler, who is present here on

11   his own recognizance.

12         THE COURT:  All right.  We're on calendar for

13   sentencing.  In connection with the sentencing, I received the

14   pre-sentence report filed on May 14th of 2025.  I received the

15   objections and memorandum filed on May 19th of 2025, and the

16   reply to the Government's papers on May 30th of 2025.  I

17   received the Government's memo filed on May 28th of 2025, and

18   the victim letters filed under seal on May 29th of 2025.

19         Was there anything else I should have received in

20   connection with the sentencing?

21         MR. BARTON:  No from the Government, Your Honor.

22         MR. ILLOVSKY:  Your Honor, I think we filed a short

23   reply brief on Friday.  I don't --

24         THE COURT:  Right.  I said on May 30th.

25         MR. ILLOVSKY:  Okay.  Okay.  Sorry, my apologies.

1                    THE COURT:  Anything else?

2                    MR. ILLOVSKY:  No.

3                    THE COURT:  All right.  Counsel, have you received

4    and read the pre-sentence report and had enough time to discuss

5    that with your client?

6                    MR. ILLOVSKY:  Yes, Your Honor.

7                    THE COURT:  Mr. Adler, do you feel like you've had

8    enough time to discuss the pre-sentence report with your

9    attorneys?

10                   THE DEFENDANT:  Yes, Your Honor.

11                   THE COURT:  All right.  Let's begin with the

12   objections.

13                   As I understand it, and there was a lot in here, so I

14   just want to make sure that we're on the same page.  There's

15   basically one objection, and that is to the 18-level

16   enhancement.

17                   Is that right, Mr. Illovsky?

18                   MR. ILLOVSKY:  That's the main objection, Your Honor.

19   It revolves around the loss calculation and, you know, our loss

20   causation arguments.  We have, you know, a couple of small

21   objections.  We made proposals to Probation in our letter to

22   supplement the report, and they declined those, and that's

23   fine.  We're not hanging on those.  We have, I guess, two

24   things I wanted to call to the Court's attention about it.

25                   One, in Probation's response to our objection to

1    Paragraph 5, which we're not pursuing, and -- but Probation did

2    say that we had mischaracterized the plea agreement by saying

3    that Andrew's lie was to keep the participants from asking or

4    negotiating for a higher rate of interest.  We said that that

5    was Andrew's goal.  Probation thought that the plea agreement

6    contradicted that.

7            It doesn't.  The plea agreement doesn't say anything

8    about Mr. Adler's intent.  It just says that the fraudulent

9    representations regarding the interest rates deceived and

10   cheated several of the participants, but it doesn't -- so it's

11   not contradictory.  I just didn't want the Court thinking that

12   we had mischaracterized the plea agreement.

13           But the main other thing is we have an issue hanging

14   out there about this interest rate reserve.  It's mentioned in,

15   you know, Paragraph 9, Paragraph 17, and that was a -- there's

16   a dispute about it.  There's some factual dispute.

17           I don't believe, unless the Court thinks it does, I

18   don't believe that the outcome of it, you know, affects the

19   loss calculation issue, which is the big thing for us, but it

20   is a point of disagreement.  And again, I think it goes to

21   atmospherics, but basically the short version of the

22   disagreement is when Mr. Adler's group, Startop, was

23   negotiating with Bitwise.  Bitwise was the Jake Soberal entity

24   that committed the fraud against Bitwise and a bunch of other

25   people.

1          There were basically -- think of two loans.  There

2   was a March loan that they were negotiating, and toward the end

3   of the negotiations, Startop gets from Bitwise an interest rate

4   reserve of 700,000.  And the idea from Startop's perspective is

5   it's a bunch of money that's going to, you know, protect

6   Startop in the event Bitwise doesn't pay.

7          It was not a -- and not characterized as a loan

8   advance or a loan prepayment.  Startop's obligation was --

9   again, they made a loan to Bitwise, Bitwise paid back the loan

10  to Startop, and then Startop would distribute to the

11  participants according to their percentage of involvement,

12  which is, you know, 2 percent, depending on how much they'd put

13  into the loan.  It was -- the interest rate reserve was not a

14  loan prepayment, wasn't a loan payment, it was something

15  negotiated between Startop and Bitwise.

16         So it's a side issue in the sense that ultimately --

17  so what happens is Hardcastle and Startop take that interest

18  rate reserve and invest it somewhere else, and then they make

19  some interest on it.  The Government says, well, you know,

20  nobody told the participants about this.  And the simple point

21  we have is that, again, it wasn't a loan participation payment,

22  it wasn't a loan payment, so no need to distribute it to

23  anybody.

24         Ultimately, Hardcastle lends the money to a Voyager

25  entity, the money gets paid back, Bitwise crashes because of

```
 1   the fraud.  Startup does distribute the 700,000 to the

 2   participants eventually.  It's, you know, trying to get them

 3   whatever money it can after the blow-up.  So we just have that

 4   factual thing, but again, I don't believe it affects the loss

 5   calculation.

 6           Otherwise, everything else for the PSR, I think, you

 7   know, objections gets resolved in the, you know, in legal

 8   arguments about loss, the loss measurement, and restitution.

 9           THE COURT:  I was just going to say, when I look at

10   that issue, I think there's really actually no real dispute

11   that the investors or participants were unaware of this

12   reserve.  It wasn't a basis for them to decide whether or not

13   to invest.  On the other hand, the way you described what

14   happened, it was Mr. Adler, too, who made the decision to use

15   that reserve by loaning it to Voyager, which, as I understood

16   it, is Mr. Adler and Mr. Hardcastle.

17           MR. ILLOVSKY:  Yeah.  Different entities were --

18           THE COURT:  Right.

19           MR. ILLOVSKY:  Different entities were involved, so

20   it gets a little complicated.

21           THE COURT:  But the --

22           MR. ILLOVSKY:  But --

23           THE COURT:  Who are the principles of that Voyager

24   company?

25           MR. ILLOVSKY:  The Voyager entity is Hardcastle.
```

1    Mr. Adler had an ownership interest in one of the Voyager

2    entities.

3              THE COURT:  So what you're saying is the money that

4    was the reserve was given -- with Mr. Adler's agreement, was

5    used by Mr. Hardcastle in his related Voyager company for

6    whatever purpose, and then he paid that money back.

7              MR. ILLOVSKY:  Yeah.  The Voyager entity paid it

8    back.  I don't want to get into an issue with the Court about,

9    you know, whether Andrew knew what Startop was doing.

10             THE COURT:  Well, I think he did, because --

11             MR. ILLOVSKY:  Yeah.  Andrew is --

12             THE COURT:  -- his factual basis says he knew using

13   the reserve in that way was wrong.

14             MR. ILLOVSKY:  Right.

15             THE COURT:  And I guess what you're saying, though,

16   is -- I'm not sure how you're saying that's wrong, because

17   Mr. Hardcastle's using this money in a way that you're saying

18   is fine to use, because the participants don't know about it.

19   This money was, I don't know, I've never heard of a guaranteed

20   investment, but in a way that they felt was secure enough.  So

21   what's wrong about it?

22             MR. ILLOVSKY:  So again, apart from that, we're not

23   arguing that Mr. Adler, you know, wasn't responsible for the

24   actions of Startop.  We're just saying that --

25             THE COURT:  Using the reserve in that fashion was

 1   wrong.

 2           MR. ILLOVSKY:  Using -- yeah, and Mr. Adler, you

 3   know, thought it was wrong, thought it was a bad idea,

 4   different from being, you know, legally wrong.  There was no --

 5   it's not part of any charged conduct.  It's not -- and the

 6   money was eventually paid back -- or distributed, sorry.

 7   Distributed -- it was paid back to Startop but then distributed

 8   to the participants.  So it's just a -- we view it as a side

 9   issue.

10           THE COURT:  I agree with you.  I don't think it's a

11   primary concern of mine, although I do think generally when you

12   have a reserve for a loan, if it's going to be invested, it has

13   to be invested in a way where it is virtually a bank account.

14   It's basically an escrow-type account.  And using it for

15   purposes other than the intent, I think is generally considered

16   inconsistent with lending principles.  But beyond that -- and

17   Mr. Adler has admitted as a factual basis that using the money

18   in that fashion was wrong.  But beyond that, I don't think it

19   plays that much into this except to maybe it illustrates the

20   entirety of what was happening.

21           MR. ILLOVSKY:  Yeah, so I agree with that.  And the

22   way it illustrates the entirety of what was happening is that

23   the money was eventually distributed to the participants.  As

24   far as the terms of how the interest rate reserve could be

25   used, I think that's going to be a complicated side issue

1  that's going to, you know, pertain to the loan agreement.  I

2  mean, it was all phony, but the loan agreement between Bitwise

3  and Startop and how -- and you know, how the -- this reserve

4  between them was going to be treated.

5          THE COURT:  I guess the thing that does strike me

6  about the reserve, though, is there was a loan origination paid

7  and that was separate from the reserve, right?

8          MR. ILLOVSKY:  Yes.

9          THE COURT:  And the loan origination payment, that

10  was disclosed to the participants.

11          MR. ILLOVSKY:  Yes.

12          THE COURT:  So that does strike me as what's

13  happening with this reserve.  Why is that not being disclosed?

14  Although I get your point that they didn't make decisions based

15  upon that because they didn't know about it.  But again, I

16  think it does bear on the entirety of what was happening.

17          MR. ILLOVSKY:  And then, so just another point for

18  the Court's consideration, it's very late in the negotiation

19  process between Bitwise and Startop, right?  So it's not

20  something -- in other words, the participants, you know, sign

21  off on loan participation agreements, doesn't say anything

22  about, you know, interest rate reserves.  There's no

23  representation about them.  There's nothing true or false said

24  about them.  And then toward the end of the negotiation of the

25  March -- sorry -- loan, Startop negotiates to get this reserve.

 1  But that's all I'll say for the Court to consider.  Again, I

 2  don't think it affects any of the loss calculation arguments.

 3          THE COURT:  All right.  Mr. Barton, your comments?

 4          MR. BARTON:  Yes, just general comments or comments

 5  as to the interest reserve, Your Honor?

 6          THE COURT:  Just the reserve issue.

 7          MR. BARTON:  I believe the Court's got it right.

 8  It's not wrong in and of itself illegal, but it is, it explains

 9  the entire situation going on here.  And the evidence, if this

10  were to go to trial, the Government would use that as evidence

11  of a state of mind of an intent.  And I think the Court, as it

12  summarized, has that exactly right.

13          THE COURT:  All right.  As to then this 18-level

14  enhancement, Mr. Illovsky, your comments?

15          MR. ILLOVSKY:  So, Your Honor, when we argued it in

16  our sentencing memo -- so I don't want to take a lot of the

17  Court's time to belabor it, but the -- we're under 2B1.1, the

18  fraud guidelines.  And as we've said in our sentencing memo,

19  the Government and we disagree on the appropriate measure of

20  the loss.  For us, because Jake Soberal is the one who stole

21  the money and got -- pled guilty and has a restitution order to

22  Startop for that money that would go to the participants.  Jake

23  stole the money, so there's no loss that can be easily

24  calculated that Andrew is responsible for.

25          And because the loss can't, as the guidelines say,

1    can't -- reasonably cannot be determined, the guideline allows

2    you to look at gain.  And so we -- our position is the best way

3    to understand the gravity of the crime and the loss attributed

4    to it is to look at the, you know, the additional interest rate

5    that Andrew lied about.

6         In other words, he -- Bitwise was paying Startop

7    three and a half percent plus, you know, 1.5 at the end, kind

8    of equity ticker kind of a thing, like a balloon payment

9    almost.  They're paying the participants too.  We say, since

10   the lie pertained to the interest rate, because Andrew didn't

11   want the other participants to -- his participants to go around

12   him to, you know, to get -- undercut them and get a better

13   rate, this was such a sweet deal from Bitwise, that the proper

14   measure should be that gain that they got.

15        Now, you know, how do we measure the gain?  Well,

16   it's easy.  We look at the history of the participation

17   agreement that Bitwise had.  And because Bitwise by that

18   (indiscernible) Startop --

19        THE COURT:  Before we do that, can we just back up?

20   I think the way you start this argument has to be upon the

21   acceptance of the position that Jake Soberal's conduct,

22   Bitwise's conduct, is an intervening cause.

23        MR. ILLOVSKY:  Yeah.

24        THE COURT:  To actually cut off criminal liability,

25   though, it has to be an act that's unforeseeable, right?

 1  Because otherwise, you can have multiple causes and still have

 2  criminal liability.

 3          So that's something you didn't address in your

 4  papers.  You just go with the assumption of because there's

 5  this conviction that the losses are not attributable.  But

 6  here, when we're -- the facts we're looking at, a 24-percent

 7  annual percentage rate is pretty ridiculous for most people.  A

 8  60-percent annual percentage rate, if you know that, most

 9  people are going to go, you know the old saying, if it's too

10  good to be true, it is.

11          And so by not giving the participants that

12  information, Mr. Adler deprived them of their ability to

13  evaluate the situation.  Because, I mean, the whole thing just

14  seems incredible.  They have $70 million in the bank, but

15  they're going to borrow $20 million and they're going to pay a

16  return of 60 percent.  I recall from business school, your risk

17  is your interest rate.  So if you know if 60 percent is going

18  to be your interest rate, that is your risk of loss, too.  And

19  if they don't have that information, they can't make an

20  informed decision.  I think that's the whole basis of this

21  criminal action.

22          So here, how do you take the position that it's

23  unforeseeable that Bitwise is simply a fraud?  How do you get

24  there?  Because I don't see it.

25          MR. ILLOVSKY:  Yeah, so there's a lot there.  And

1  I'll maybe try to address them in reverse.  The -- a loan has a

2  lot of different risk factors.

3         Look, Andrew was defrauded, and Startop was

4  defrauded.  We know that.  It says it in the factual predicate.

5  Bitwise lied.  Yeah, in retrospect, it was obvious.  They're

6  not the only people that Bitwise snookered.  Bitwise snookered

7  people all across the valley, big names, big banks.  They did

8  it, and they did it with the same kind of stuff.  What --

9         THE COURT:  Yeah, but we're not talking about

10  Bitwise.

11         MR. ILLOVSKY:  Right.

12         THE COURT:  We're now talking about what --

13  Mr. Adler's snookering of people.

14         MR. ILLOVSKY:  But it -- right, but it goes to the

15  foreseeability.  You -- we say, and we do address it in our

16  papers, that he can't be held -- he can be held responsible

17  only for stuff that was reasonable -- that he knew or should

18  have known is actually the standard in the guidelines.

19         And it's just simply not, we think, not fair and not

20  right to say that he should have known Jake was a fraud.  So

21  the fact that other people were snookered, big banks and so on,

22  is relevant to it.  What's also relevant to it is that the

23  interest rate -- I didn't go to business school, but this is

24  how I think about it.  The interest rate is one risk factor for

25  a loan, right?  That's credit.  That tells you, you know,

1  credit risk.

2        The other risk factors in terms of their protection

3  that the lender has are things like, well, is there security?

4  Is there collateral?  The interest rate might be crazy high,

5  but there might be a ton of collateral that's --

6        THE COURT:  Everything you're mentioning, though, is

7  the information that the participant should have had, because I

8  realize that they've got information about this collateral, but

9  when you are talking about the interest rate you are talking

10  about, 60 percent, if you have all of this legitimately, you've

11  got all this cash in the bank, you've got all this property,

12  you don't pay 60-percent annual interest rate.  I mean, that's

13  just -- you just don't.  You don't have to.

14        And so that would have, and maybe there's a lot of

15  explanation that could have been offered for that, but the

16  participants were deprived of the ability to ask those

17  questions.  So that's why I'm still at the point of the fact

18  that other people were defrauded.  I don't know the terms of

19  those loans or those investments.  I don't know.  But here,

20  given that, given the facts here, how is it that it wasn't --

21  how can you say as a matter of law that it was not foreseeable

22  such that criminal liability would be otherwise excused?

23        MR. ILLOVSKY:  So let me unpack stuff.  The

24  participants were provided the information that Andrew and

25  Startop were getting.  They were -- and you don't have to take

1    my word for it.  One of the --

2              THE COURT:  No, I know.  I'm not saying that they

3    weren't.  I'm talking about the interest rate.  That's the only

4    thing, as I understand it, was not given.

5              MR. ILLOVSKY:  That's true.  That's totally true.

6    But, you know, the information about all of the other stuff

7    was.  It was passed on.  They -- Andrew believed it.  That's

8    why it said that they were defrauded by Bitwise.  We know from

9    one of the victim letters, the anonymous one, which is a little

10   weird, that they were told a lot of information.

11             But, yes, they were not told about the interest rate

12   that Bitwise was paying Startop and that it was, you know, a

13   percentage and a half more.  But, you know, the point of the

14   intervening causation is we don't believe it's fair or

15   reasonable to expect someone to believe that someone who is

16   that well-known in the community, in the press, and so on, is

17   engaged in a major fraud.  The Court would have to say --

18             THE COURT:  I think Mr. Madoff would disagree.

19             MR. ILLOVSKY:  But the --

20             THE COURT:  I mean, this isn't a unique situation.

21   It has happened historically.  That's why it's so important

22   that the investors have all the information so they can ask

23   these questions.  Because having collateral, having $70 million

24   in the banks, all sounds great until you realize, well, wait a

25   minute, then why is this happening?  Why are you willing to pay

1  this type of interest rate?  You don't have to.  Why would you?

2        MR. ILLOVSKY:  Right.  So, again, the participants

3  were not told about the interest rate, and they loaned the

4  money to Bitwise.  As we said in our paper -- and they knew, so

5  you're making a loan, you know there's collateral, you know

6  there's money in the bank.  You're not told about the interest

7  rate.  You make the loan.  The loan -- the money gets stolen by

8  fraud.  What the interest rate deprived the participant of, as

9  I think the Court said, is the risk -- is the credit risk.

10 Bitwise did not fail because of credit risk.

11        It wasn't that Bitwise was in business and, you know,

12 couldn't make, you know, they couldn't sell enough widgets, and

13 they couldn't make the rent.  That's what the interest rate is

14 all about.  The --

15        THE COURT:  Interest rate is more than that.  It's

16 risk of all types.  This is the risk of nonpayment is

17 60 percent, right?

18        MR. ILLOVSKY:  Right.  It reflects -- it generally

19 reflects credit risk.  That's how people make those

20 calculations.  What's the likelihood of --

21        THE COURT:  So whether it is you don't produce enough

22 widgets or somebody in the company is skimming or something

23 else, that is the risk of nonpayment.

24        MR. ILLOVSKY:  It's a risk of nonpayment, but it's

25 not a credit risk.  Credit -- again, credit risk is I make you

1   a loan at some percentage of interest and the interest turns

2   out to be too high and you -- or not, but you can't pay the

3   loan.  Interest is just that.  It's not a reflection of, you

4   know, the risk of somebody stealing the money.  It's totally

5   different things.

6          That's not what interest rates are based on.

7   Interest rates are not based on, I don't think, the risk that

8   somebody is going to steal.  You know, that's --

9          THE COURT:  Well, I think that's -- I don't think

10  that's accurate.  I think it's the risk entirely in the entire

11  enchilada of not being repaid, because it doesn't say, you

12  know, if Bitwise fails to have sales of X, then this is the

13  risk.  Otherwise, you wouldn't have collateral.  You wouldn't

14  have money in the bank that makes any difference because you're

15  not talking about -- it's to insure against loss.  And it's not

16  a particularized -- or at least I didn't see in this agreement

17  where they say we're only concerned here; this interest rate is

18  only to address this issue.  It is the risk of loss.

19         MR. ILLOVSKY:  Right.  And maybe we're going around

20  the same thing.  But, you know, again, our argument is that

21  when, you know, people negotiate interest rates for all kinds

22  of reasons.  There are interest rates out that the market sets.

23         THE COURT:  Mm-hmm.

24         MR. ILLOVSKY:  And those interest rates are

25  generally, we think, thought to reflect likelihood of

1    repayment, but not likelihood of repayment because somebody

2    blows up their building or not likelihood of repaying because

3    it's just a bunch of hypothetical, unimaginable things.  It's,

4    we don't think that's how --

5            THE COURT:  Right, but that's what we're -- that's

6    exactly what we need to talk about.  Is it hypothetical?  Is

7    it, you know, so unpredictable that this was going to happen

8    that from your perspective, the losses should not be

9    attributable to Mr. Adler?  And that's the question I have.

10   And you're saying a lot of reasons why this theft, this fraud

11   was unpredictable.  And I'm trying to figure out why you think

12   that, because the fact that other people invested on other

13   terms I'm unaware of doesn't help me.

14           What I do need to understand though, is in this

15   factual scenario, you know, why is it unpredictable that this

16   money would not be repaid except for the interest rate is a

17   certain -- I mean, like one of the victims said, this was a red

18   flag.  If I had known this, never, never would I have invested.

19           And I guess that's the other point too, is

20   Mr. Adler's not -- there's no attempt to hold him responsible

21   for the entirety of the 20 million.  It's only the people who

22   say, if I had known that, I wouldn't have invested, right?  So

23   we're not talking about 20 million.  We're talking about a

24   fraction of that.

25           MR. ILLOVSKY:  So maybe if I try it this way, maybe

1   this will help the Court.  If the -- we're talking about the

2   interest rate.  If it were a regular kind of business risk, you

3   know, risk of not being paid, there's a big -- in a regular

4   case, there'd be a big chunk of money in the bank and a big

5   chunk of collateral.  So if it doesn't get paid, there's still

6   stuff out there to protect it.  That's why before, when --

7   before all this stuff happened, Startop, you know, immediately

8   brought a lawsuit to execute on the pledged collateral.

9          So if it -- the only reason why the collateral wasn't

10  there and the money in the bank wasn't there to protect

11  everybody, including Startop, was because it was a fraud.  And,

12  you know, to say that, well, taking collateral is just, you

13  know, a hedge against the fact that the guy you're dealing with

14  might be a criminal and fraud, that just -- to us, it kind of

15  proves too much.  It doesn't really capture the economic --

16  what we see as the economic reality of it.

17          And so that's why we view the interest rate as just

18  one component.  And if you are thinking of Mr. Adler's state of

19  mind or intent, well, he must have known that the 60 percent

20  was a fraud -- was a bad amount.  Yeah.  But in his mind,

21  that -- and that -- in true -- and in retrospect, it's obvious.

22  It's a lot.  It's crazy high.  Twenty-four is crazy high, okay?

23  We get that.  It's private lending.  These are bridge loans.

24  Bridge loans, necessarily, are, you know, short term.

25          THE COURT:  They're not 24 percent.  And they're

1   certainly not 60 percent.  They're usually 12, 15, 24 is

2   ridiculous.  60 is unheard of, I think.

3              MR. ILLOVSKY:  Yeah, no argument.  No argument about

4   that.  That's why --

5              THE COURT:  But what you seem to say, though, is the

6   fraud is what makes the difference.  But Mr. Adler would still

7   be sitting in the same chair if Bitwise failed for business

8   reasons.

9              MR. ILLOVSKY:  Well, it'd be in a different

10  courtroom, I think.

11             THE COURT:  I don't think so.

12             MR. ILLOVSKY:  But -- so let me try this again,

13  because we're going back to -- not to disagree with anything

14  the Court says about the interest rates and all of that.  Okay.

15  I mean, that's why he's sitting here.  We -- his state of mind

16  was, and again, the factual predicate of the plea agreement is

17  that they were defrauded.  They were defrauded by Bitwise, and

18  they were.

19             His state of mind was thinking as a hard money

20  lender, is yeah, there's an interest rate, but that's crazy.

21  It's crazy high.  And he did have questions about it and raised

22  them with Hardcastle.  But yeah, that's crazy high.  But wait a

23  second.  They've got $70 million in the bank.  Well, that's

24  good, because even if this interest rate is crazy high, they're

25  probably planning to pay it back pretty quick, and there's a

```
 1   lot of money in the bank, and then they turn to these pledge

 2   properties, which is, like, I don't know, like, 30 million in

 3   collateral and maybe more for 20 million in loan.  So Andrew

 4   sees the collateral, sees that -- the money in the bank -- and

 5   there's other factors, but I'm just focusing on the main stuff

 6   -- and sees the interest rate, and it's like, okay.  And I

 7   know, in retrospect, we want to say, yeah, 60, that's just --

 8   60 is crazy.  In isolation, yeah, but it wasn't in isolation

 9   for Andrew at the time.

10           We're talking about criminal intent.  We're not

11   talking about, hey, you should have seen this, you should have

12   seen that.  We're talking about, did you know it was a fraud or

13   should you have known --

14           THE COURT:  But Mr. Adler's already pled to this, and

15   he's already admitted a scheme intended to defraud, right?

16   That's in the factual basis.

17           MR. ILLOVSKY:  True.

18           THE COURT:  So it's not about what Mr. Adler thought

19   anymore.  It's about was this foreseeable that Bitwise would

20   fail, and then his participants in Startop were deprived of the

21   ability to actually make a reasoned decision as to the

22   investment?  Was that foreseeable, that's what we're talking

23   about.

24           MR. ILLOVSKY:  Right.  And -- well -- and so even on

25   those terms, we would say, no, it's not reasonably foreseeable.
```

1    It is -- it's reasonably foreseeable if you're just looking at

2    an interest rate.  I think -- I mean, I think anybody would

3    have been they should have said, wait, this is -- I mean, this

4    is crazy.

5              THE COURT:  You mean at 24 percent?

6              MR. ILLOVSKY:  60 percent, right.

7              THE COURT:  But they didn't know the 60 percent, so

8    they couldn't have.

9              MR. ILLOVSKY:  Right, but I'm just focusing on

10   Andrew's state of mind because the question is, could he have

11   reasonably foreseen?  It's his conduct that we're focused on

12   for, you know, the loss adjustment and for what he is

13   responsible for.  And so, agreed, 60 percent that he sees from

14   Bitwise is crazy.  And doesn't tell that that's what they're

15   making.

16             But again, he's also thinking of the collateral --

17   it's over collateralized -- and the money in the bank.  Way

18   over collateralized, you know, from that cash perspective.  So

19   we don't think that it's fair to say that that was -- that

20   Jake's committing a fraud was reasonably foreseeable, and the

21   fraud is what, of course, made the participants lose their

22   money.  Andrew didn't -- when Andrew got people to make loans

23   to Bitwise, he wasn't getting the money, he wasn't stealing the

24   money.

25             Yeah, they were making a loan under conditions that

1  they didn't know the full extent of, that's true.  One

2  reflection of the fact that this is a complicated issue is that

3  we have people who are participants who lost money who actually

4  said, yeah, the interest rate wouldn't have made a difference

5  to me.  They actually said that.  They're --

6          THE COURT:  Which is why we're not talking about

7  those people, we're only talking about the --

8          MR. ILLOVSKY:  Well, they're participants subject to

9  the very same wrongful conduct.

10          THE COURT:  Right, but we're not talking about that

11  in the calculation for the 18-level increase, because the 18-

12  level increase only requires the amount that we're talking

13  about.  It's like a 3.5, I believe.

14          MR. ILLOVSKY:  Right, I'm not -- right, I'm not

15  offering that as a --

16          THE COURT:  What's your calculation, though, because

17  I understood what you were --

18          MR. ILLOVSKY:  I'm offering it as a -- sorry.

19          THE COURT:  Right.  Your calculation, I think, was

20  saying it's basically the amount of money that Mr. Adler would

21  have made.

22          MR. ILLOVSKY:  No.

23          THE COURT:  Okay.  Explain to me your math.

24          MR. ILLOVSKY:  The actual gain.  The guidelines say

25  actual gain.

1          THE COURT:  Explain your math then, because I think

2     the number that you got to, I didn't -- I saw how you

3     calculated it, I didn't understand the rationale behind it.

4          MR. ILLOVSKY:  Yeah, sure.  So it's on a limited set

5     of victims, right?  The Government has just a bunch of

6     participants, but some told the FBI, yeah, the interest rate

7     wouldn't have made a difference, that we weren't focused on it.

8     That goes to the reasonableness of Andrew's state of mind,

9     because some of his own participants had the same state of

10    mind.  But -- so it's a smaller subset of those victims.

11         And then we look at, well, when Startop was

12    collecting loan payments from Bitwise, it was making the

13    distributions.  It wasn't stealing it; it was making the

14    distributions to the participants.  It was distributing, you

15    know, based on 2 percent per month.  So there's actually three

16    or four months where there are payments to the participants.

17    And so -- and by the way, Startop was a participant and all

18    that.  So you take that period and you take the actual interest

19    rate paid, but then you look at the actual interest earned by

20    Startop, which was 3.5 percent.

21         THE CLERK:  Counsel, can you get closer to the

22    microphone?  We're recording.

23         MR. ILLOVSKY:  Sorry, I was -- yeah.

24         So if you take the distributions at 2 percent, you

25    look at what Startop was making from Bitwise, 3.5 percent a

1  month, you subtract 3.5 minus 2, and that's the profit that

2  Startop -- Andrew, didn't tell the participants about.  So for

3  the --

4          THE COURT:  What about the 1.5 percent?

5          MR. ILLOVSKY:  I'm sorry?

6          THE COURT:  What about the additional 1.5 percent?

7          MR. ILLOVSKY:  That doesn't get paid until the end,

8  so that would -- that's not part of the actual gain.  It

9  wasn't -- the actual payments were 3.5 percent per month.

10          THE COURT:  So you're saying we should only look at

11  the actual -- what actually happened as opposed to the terms

12  and what was intended.

13          MR. ILLOVSKY:  Right.  The guidelines say that if the

14  actual loss can't be reasonably determined, then you look to

15  the gain.  And the Court says it's the gain that resulted from

16  the offense.  And it does not mean -- therefore, it does not

17  mean intended gain.  It just means the gain that was made from

18  the offense.

19          THE COURT:  Okay.  So I guess I did understand your

20  rationale.  I thought there might have been something else.  So

21  I did understand where that was coming from.  I don't agree

22  with it, but I do understand why you're calculating it in that

23  way.

24          Anything else as to this objection then?

25          MR. ILLOVSKY:  No, Your Honor.  Just to say that

1    it -- the issue also carries over to the restitution argument

2    on the basis that, you know, again, restitution is giving back.

3    It's not giving up.  Giving up is disgorgement.  That's not

4    what's provided for in the statutes or in the guidelines.  And

5    so the restitution amount of giving back on our analysis

6    doesn't count.  There was already one crime committed by

7    somebody not associated with Andrew, and in fact, who

8    victimized Andrew.  So that crime and that cause of that loss

9    leads to -- sorry, I lost my train of thought looking at a

10   note.

11            Again, restitution is already accounted for in the

12   Jake Soberal case.  He, and it's a record, he stole

13   $115 million.  Twenty of it was Startop's money, which was

14   obviously the participant's money.  That's the subject of a

15   restitution order.  If not, we'd be saying that a completely --

16   an independent crime by somebody else who was actually a victim

17   of that person has to pay the same amount of restitution

18   discounted by -- adjusted by the number of participants or

19   whatever, but using the same measurement of -- that the idea is

20   that he caused all of their money to be lost, which is not the

21   case.  It's Jake Soberal that caused the money to be lost.

22   That was an intervening -- or the proximate cause was Jake's.

23   We know that it was approximate cause because as I said,

24   Startop was making payments.  Had Bitwise not been a fraud,

25   very clear, Startop would have continued to make those

 1  payments.

 2          Hold on a second.  That's -- oh, yeah.  Yeah, yeah,

 3  yeah.  I think -- not to belabor the Court with that, but there

 4  were, just on the whole issue of high interest, not to re-dig

 5  the same hole, but there had been prior loans that other

 6  participants had gotten into that were actually at higher

 7  interest rates that had been paid back.  It was part of the

 8  Bitwise scam.  I mean, they --

 9          THE COURT:  That's the thing, though.

10          MR. ILLOVSKY:  -- confidence scam, you know.

11          THE COURT:  These participants didn't know about that

12  to the extent that they didn't know about their own interest

13  rate.  So the fact that they say, oh, these people, you know,

14  are paid 75 percent, you know, suckers, they got lucky.  But

15  it's also, again, a red flag because that's always the way it

16  works in a Ponzi scheme.

17          The initial investors are paid back so that more

18  people jump in, more people invest, and ultimately, the early

19  investors get their money back and the later investors don't.

20  That's the way they always work.  And if you know you're going

21  to be getting a 60-percent interest rate, at least it can flip

22  through your mind what is going on here, right?  So I don't

23  really think that that cuts one way.  I think it goes both

24  ways.

25          MR. ILLOVSKY:  Just describing for the Court what was

 1 | in Andrew's state of mind.

 2 |        THE COURT:  No, but it doesn't matter at this point,

 3 | because he's already admitted -- he -- I mean, I can bring the

 4 | language out, but he has already admitted and the Court has

 5 | already convicted him on the facts that he agreed to that he

 6 | developed an artifice and scheme to defraud others, right?

 7 | That's the exact language of the factual basis of his plea.

 8 |        MR. ILLOVSKY:  Well, again, it's -- that's general

 9 | language.  But the -- again, the crime which is in the factual

10 | predicate was making -- was misrepresentations about the

11 | interest rate.  Yeah, it's --

12 |        THE COURT:  Well, let's not dance around it.  The

13 | factual basis says specifically he knew the unlawful purpose of

14 | the plan with Hardcastle, he willfully joined the plan, and

15 | acted with the intent to accomplish the plan and the intent to

16 | defraud, right?  He admits his intent to defraud in the factual

17 | basis.

18 |        MR. ILLOVSKY:  Right.

19 |        THE COURT:  So we can't just keep saying, you know,

20 | he was an innocent victim in this because if he were, we

21 | wouldn't be sitting here at a sentencing hearing in which he's

22 | already been convicted.

23 |        MR. ILLOVSKY:  Right.  And we're not saying that.

24 | What we're saying is what were they defrauded out of?  And

25 | we're doing the loss discussion.  We're not saying that Andrew

1    is not responsible.  He pled guilty.

2                THE COURT:  Right.

3                MR. ILLOVSKY:  What we're --

4                THE COURT:  But I keep hearing language that

5    sounds -- instead of addressing the objection, I'm hearing

6    language that he's not really responsible.  And that's not what

7    we're talking about here at all.

8                MR. ILLOVSKY:  That's not the -- yeah, then that's

9    not the thrust of my comments.

10                THE COURT:  Okay.  Because I just want to make sure

11    that you are not walking away from your plea agreement here,

12    because that has consequences.  And I want to make sure that we

13    are on the same page that you're not doing that.

14                MR. ILLOVSKY:  No, I don't -- no.  And nothing I said

15    is aimed at that.  As our letter points out, this is all about

16    the relevant conduct, the loss calculation.  And you can't get

17    to the proper loss calculation without arguing about what the

18    scope of the offense is.  And that's all I'm doing.  I'm not

19    saying that there was no offense.  I'm just helping the Court

20    understand what we see as the scope of the offense.

21                THE COURT:  Okay.  Anything else, then, on the

22    objection?

23                MR. ILLOVSKY:  No, that's all we have on our

24    objections to the PSR, Your Honor.

25                THE COURT:  Mr. Barton, your comments?

1          MR. BARTON:  Yes, Your Honor.  I think the Court's on

2     the right track here.  Just to go on with the factual basis of

3     the plea agreement, it goes down, I believe, the third

4     paragraph on Page A-1.  "The defendant deceived and cheated

5     several participants out of their money by making the loans

6     appear less risky and therefore more appealing to them than

7     over ten of the participants who together funded more than

8     $3.5 million of the loans would not have done so had they known

9     the truth."

10          And that's -- that is the loss calculation right

11     there.  That is saying that Mr. Adler knew these loans were too

12     risky.  He knew something was wrong.  He altered the interest

13     rate to hide that from the participants because he knew there

14     was a good chance he wouldn't get their money if they knew the

15     truth.  And that's what those participants told the Government.

16     And that's what we're here telling the Court.

17          THE COURT:  All right.  Mr. Illovsky, anything else

18     on the objections?

19          MR. ILLOVSKY:  Nothing else, Your Honor.

20          THE COURT:  When I look at the issue of an

21     intervening cause, at least according to California law, the

22     cause has to be independent.  Means that it must be

23     unforeseeable at the time.  And it must, in essence, be an

24     extraordinary and abnormal occurrence.

25          In this instance, the attempt to parse between the

1  fraud of Bitwise and the risk of loss, the risk that the loan

2  would not be paid, I don't think is an appropriate discussion.

3  I think at issue here, as you pointed out, is there are people

4  who are going, I don't care if it was 60 percent, I was going

5  to invest anyway.  But there were people who were also saying,

6  had I known that, I would have been able to evaluate my

7  situation, I would not have invested.

8         So it doesn't -- I don't think the fact that Bitwise

9  was a fraudulent -- ultimately was engaged in fraud addresses

10 this situation.  I don't think that the risk of nonpayment

11 wasn't there simply because of that fraud.  And so it does not

12 appear to me that there is a showing that it was extraordinary

13 or abnormal occurrence that the 60-percent annual interest rate

14 would not be repaid and that the principal would be lost.

15 Consequently, the objection is overruled.

16        However, I do adopt the guideline calculations in the

17 pre-sentence report.  I adopt the findings and determine them

18 to be true and correct.  I find the applicable offense level is

19 22.  Mr. Adler's criminal history places him in a criminal

20 history category, Roman Numeral I.  The advisory sentencing

21 guidelines call for a term of imprisonment between 41 and 51

22 months.  And the charge of which he has pled guilty carries

23 with it a term of imprisonment of up to 20 years in custody.

24        I am aware of my obligations under Booker and Fanfan

25 to impose a sentence that is fair and reasonable.  I will give

1  due weight to the statutory factors set forth at 18 U.S.C.

2  Section 3553(a).  Probation is recommended the sentence of 41

3  months.  The Government has recommended the sentence of 41

4  months.  Defense seeks a sentence between 21 and 24 months.

5         We have Officer Pascual from Probation here.  Do you

6  have any comments at this time?

7         MS. PASCUAL:  No, Your Honor.

8         THE COURT:  Mr. Barton, your comments.

9         MR. BARTON:  Thank you, Your Honor.  Your Honor, in

10  short, this is a -- it's an ugly story here.  This is -- you

11  had the Bitwise fraud, and it's not any surprise that Bitwise

12  attracted other wrongdoers into its realm.  And here, the

13  defendant has told you that -- or told Probation in the PSR

14  that what he did was out of greed.  He wanted to make more

15  money.  He had no reason to do it other than trying to make a

16  million dollars or whatever it may have been in a year.  Quick,

17  fast money is what he was trying to do.

18         He didn't need the money.  He had a good life, had a

19  good upbringing, had plenty of resources, had gainful

20  employment, but he chose to make money -- try to make money the

21  easy way, the wrong way, and the illegal way.  And when he did

22  so, he hurt people.

23         The Government has submitted victim impact statements

24  to the Court.  The Court's read them.  I believe the one from

25  Long Angle who gave the Government permission to disclose their

1  identity is significant.  It shows the hurt that this causes.

2  When you commit a fraud like this, you take down companies that

3  invest other people's money, and the fraud has tentacles.  And

4  it's long-lasting.  And companies like Long Angle, this can

5  destroy them when this happens, when some kind of gig happens

6  like this, and they trust that they're being provided with the

7  correct documents.

8        Especially in this day and age, when we rely on

9  electronic documents and electronic records, if they're being

10 altered and signatures are being forged, you don't know the

11 true story.  How could you, right?  Other than coming here and

12 talking to Jake Soberal himself, it just becomes almost

13 impossible for victims like them.

14       And then the other -- to address defense counsel's

15 statement as to the other victim, the other victim, I'll submit

16 to the Court, is one of the victims that lost money.  They have

17 asked the Government not to disclose their identity.  They've

18 had other experiences not related to Mr. Adler with defendants

19 in court that have made them fearful of disclosing their

20 identity unless they absolutely have to.  That's the reason for

21 the anonymous letter there.  But I will submit they are one of

22 the investors listed in the PSR.

23       And then from there, Your Honor, I want to say that

24 the loss amount here that we've arrived at between 3.5 million

25 and 9.5 million, that was artfully crafted by the Government.

1    And here it's saying, I think as the Government, there's an

2    argument that you could go after the entire 20 million.

3    Because the standard is what a reasonable person would have

4    done had they known the true interest rate.  It's not what an

5    individual person would have done.

6            But nonetheless, out of an abundance of caution, the

7    Government has said, let's discount roughly half the investors

8    that said they wouldn't have -- this interest rate didn't

9    matter to them.  And maybe that's because it truly didn't.

10   Maybe that's because they were friends or family or

11   acquaintances of Mr. Adler.  But the Government was very

12   conservative in cutting them out.  And I raise that point

13   because we're in the 3.5 to 9.5 million loss bracket for a plus

14   18, but we are at the very top of that bracket, right?  This

15   isn't a $3.5 million loss case, it's about 9.3 million, maybe

16   9.4.  So we're at the very top.

17           I say that to say, I think that's one reason why I

18   believe the guidelines here get it correct, is we're at a 41 to

19   51 guideline month, but just a couple hundred thousand dollars

20   more would have put this into another guideline bracket.  That

21   is one key argument the Government is saying supports a

22   guideline sentence of 41 months in this case.

23           And then I want to say a little bit about the

24   interest reserve.  I think the Court's got it right, but again,

25   it shows the mentality here, right?  Get money quickly and then

1  do what you want with it.  That's what Mr. Adler and

2  Mr. Hardcastle did.  They got these loans funded, they put a

3  bunch of other people's money at risk, and as soon as they got

4  a chance to pocket some quick money and do other -- get other

5  personal benefits, they did it.  They took this 700 grand that

6  was supposed to be there and protect other investors in the

7  event of non-payment or something -- some other bad event, and

8  they took it and invested for their own personal gain.

9        And that just shows the mentality here of what they

10  were thinking.  They were trying to make as much money as

11  possible.  They didn't care about the risk they were putting

12  other people in.  That's why Mr. Adler's admitted in his plea

13  agreement that he deceived and cheated people.  He did not care

14  that their money was at risk.  What he cared about was making

15  money for himself.  He wanted to make as much as he could as

16  quickly as he could.

17        And for that, the Government believes a significant

18  punishment is warranted here, and I think it's one, specific

19  deterrence.  Mr. Adler is in his early 30s, and he has to know

20  that you can't do this.  This has consequences.  These

21  aren't -- when you change interest rates and numbers and all

22  that on finance documents and forge signatures, this isn't just

23  an edit you make on a computer or something like that.  This

24  has real consequences.  This can ruin companies.  It can ruin

25  people.  It can take people's life savings.  He has to know he

1  can't do that going forward, and that he never does that again

2  is my hope.

3          And then two, general deterrence here.  You know, you

4  can't divorce this case from the Bitwise fraud.  Bitwise

5  brought several wrong actors into its sphere, and in the

6  Government's view, that has to be stamped out.  You have to

7  make sure -- the Government wants the Court to do whatever it

8  can to make sure this doesn't happen to Fresno and the Valley

9  ever again.  Probably impossible to make that promise that we

10  can ever stop a massive fraud from happening again, but we sure

11  can send a message, and the message is don't come here and do

12  this, and anybody came here that helped Bitwise do it.

13          In the Government's view, Mr. Adler kind of did,

14  right?  He knew that something wasn't right with Bitwise, and

15  rather than stop, say, whoa, I don't want any part of that,

16  let's stay away from this, he said, great, let's take advantage

17  of it so I can profit and make some money quickly.  Hopefully,

18  I make my money before it collapses.  That's his mentality.

19  That mentality has to be stamped out, and the Court -- the

20  Government wants a strong message that that will not be

21  tolerated here in the Eastern District of California.  That is

22  the Government's request.

23          And then last, as the Government's argument for a

24  guideline sentence here, Mr. Adler has agreed to a

25  pre-indictment resolution.  The Government appreciates that,

1   but the benefit that he has already gotten from that has been

2   accounted for.  He, as admitted in the factual basis, he forged

3   Jake Soberal's signature on the documents.  There's a clear

4   reason why he did it.  It was to further the fraud.  That is

5   aggravated identity theft.  He has not been charged with

6   aggravated identity theft as a result of a pre-indictment

7   resolution with the Government.

8        So I believe that the two facts, the loss amount

9   being right at the top of the plus-18 enhancement bracket, plus

10  the fact that the Government has agreed to forego aggravated

11  identity theft, certainly puts this case right in the heartland

12  of a low guideline sentence of 41 months.  That is what the

13  Government would request.

14       And I want to point out one other thing in the

15  Government -- or defense's reply, when they said they're trying

16  to equate the sentence that Jake Soberal got, 11 years for

17  $115 million fraud, and saying Adler is only -- Mr. Adler is

18  only responsible for a fraction of that.  You can't view it

19  that way.  You have to look -- Mr. Soberal got 15 percent of

20  his guideline sentence taken off.  That's it.  He got about a

21  15-percent break, maybe a 14-percent break, right?  So even

22  applying that here to Mr. Adler would be about a three-year

23  sentence as opposed to 41.  That's the appropriate way to

24  compare them under the guidelines.  You can't just take a 11

25  years, $115 million, and say, well, this -- Mr. Adler is only

1  responsible for, you know, $9.3 million or whatever it may be,

2  and that's less than 10 percent of what Jake Soberal was, so he

3  should get 10 percent of the sentence.  That's not how the

4  guidelines work.  I believe the Court knows that.

5        And with that, the Government will submit unless the

6  Court has any questions.

7        THE COURT:  Mr. Barton, what's your comments about

8  the restitution issue?  Because Mr. Illovsky is correct that

9  the Bitwise defendants do have a restitution order, and of

10  course, the participants here are not entitled to a double

11  recovery.

12        MR. BARTON:  They aren't, Your Honor, but I believe

13  under the Mandatory Victim Restitution Act and the law that it

14  can be joint and several.  In fact, that's the --

15        THE COURT:  Right.

16        MR. BARTON:  It should be joint.  Mr. Adler's

17  restitution should certainly be joint and several with Jake and

18  Irma, whoever pays first.  Fine.

19        THE COURT:  All right.  So it's just that the PSR

20  does not recommend that joint and several language, but I --

21  that makes sense.

22        MR. BARTON:  No, and that was the Government's

23  assumption, that it would be ordered joint and several.

24        THE COURT:  The other issue I have is about the Long

25  Angle victim impact letter.  Why should that remain sealed?

1             MR. BARTON:  It's the -- they wanted to file their

2    statement.  They were okay with the Government mentioning their

3    name in court.  They want to not -- they have a right to

4    anonymity under the guideline -- under the law.

5             THE COURT:  But they've --

6             MR. BARTON:  They don't want that statement out

7    there.  You know, they're worried it may be picked up by the

8    press, something to that extent.  And I think that's -- in a

9    case like this, I think that's a fair risk.  This isn't -- you

10   know, this -- Bitwise has received publicity.  This case may or

11   may not, I'm not sure.  But I believe it's a fair kind of

12   consideration.  And for them, it's an ugly chapter that they

13   want to get past.  They're hurt.  And, you know, they want this

14   to be done with.  They've done their part.  They've made their

15   statement to the Court.  But I do believe it should be under

16   seal.  I don't believe defense would have any objection to that

17   letter remaining under seal.

18            THE COURT:  All right.  Anything else at this time?

19            MR. BARTON:  No, unless the Court has questions.

20            THE COURT:  I don't have any at this time.

21            Mr. Illovsky, your comments?

22            MR. ILLOVSKY:  Yes, Your Honor.  Before I start, I

23   think the Mandatory Victim Restitution Act -- or whatever it's

24   called, I never get it right -- allows for joint and several

25   only where there's co-conspirators.  So I don't think there's a

1  provision in 3663 or 3664 that allows joint and several for

2  independent crimes.  I just think that that's what the statute

3  says.

4          THE COURT:  So then how do we deal with the mandatory

5  restitution requirement?

6          MR. ILLOVSKY:  Well, again, we -- Your Honor, we

7  proposed a, you know, a -- an alternative loss calculation that

8  the Court could --

9          THE COURT:  But even in that event, there would be

10  duplication, right?

11          MR. ILLOVSKY:  Yeah, it's a --

12          THE COURT:  So then how do we deal with the mandatory

13  restitution issue if you're saying, well, they shouldn't get --

14  it can't be joint and several.  So how do you propose to

15  address that?

16          MR. ILLOVSKY:  Well, I just do believe that there are

17  going to be situations where you -- it's unusual and you don't

18  have an easy fit for restitution.  I understand that --

19          THE COURT:  Are you saying he should not have a

20  restitution order then?  Is that what you're ultimately saying?

21          MR. ILLOVSKY:  No, I think that the Court could base

22  a restitution order on our proposed alternative gain

23  calculation if it wanted to make one at all.

24          THE COURT:  Okay.  Let's say I do that.  How do I do

25  that?  Because you still have a situation of some amount of

1    restitution being ordered, right?

2            MR. ILLOVSKY:  Yeah.  Yeah, I think -- right.  I

3    think to the extent that it's just, you know, the interest that

4    Startop gained, it's not a duplicative payment because it's for

5    this -- for a different offense.  So I would say the Court

6    could fashion -- you know, has the discretion to fashion some

7    restitution award within those bounds, but --

8            THE COURT:  So now you are saying, well, basically it

9    should be disgorgement, right?  Instead of -- I mean, this is a

10   mandatory restitution case.  So that's the legal issue I'm

11   contemplating.

12           MR. ILLOVSKY:  Right.

13           THE COURT:  So how do I address that in your view?

14           MR. ILLOVSKY:  Right.  I think that the Court, again,

15   has the discretion to create some appropriate restitution order

16   if the Court thinks that, you know, there should be -- that

17   restitution is mandatory, even where there's a very strong

18   argument, you know, for an intervening or superseding cause.

19           THE COURT:  All right.

20           MR. ILLOVSKY:  Because the -- because restitution

21   is -- only goes to, you know, gain from the -- gain from -- you

22   know, we say the law is attributable to the offense.  And

23   anyway, that's our argument.  It's not a neat thing, honestly.

24           THE COURT:  Okay.

25           MR. ILLOVSKY:  But the statute does allow joint and

1  several only for, you know, co-defendants.  But thank you, Your

2  Honor.

3         So we've briefed a lot of issues for the Court.

4  We've submitted Andrew's own letter, and we've submitted dozens

5  of letters of support for leniency -- over 60 of them.  I don't

6  know how many people that come before Your Honor have been able

7  to claim that sort of support and that many pleas for leniency.

8  And they're not only from friends and family, but they're also

9  from participants who lost money in their Startop investment.

10 I think that the Court might find this show of support from

11 victims and other participants really extraordinary, or at

12 least unusual.  And just to -- and I know we quoted the

13 letters, but just to remind the Court of what some of the

14 people said.

15        David Prater, who was a big investor, said -- he

16 explained, "While Andrew should not have affirmatively lied to

17 investors about Bitwise interest rate, I don't believe his lie

18 should result in him going to prison for it."  He says he'd

19 like to share with the Court is confidence in Andrew's ability

20 to learn from his mistakes and his commitment to make amends to

21 those mistakes.

22        There's a letter from Brennan Lowney, who's another

23 investor and a close personal friend.  He's a biotech

24 executive.  He says, "Even after all this, I trust Andrew with

25 my life, and my confidence in him remains unshaken.  I'm not

1   someone who forgives easily," he says, "especially when it

2   comes to personal loss, but Andrew's sincerity, humility and

3   full acceptance of responsibility moved me.  I respect and

4   admire him for that.  He's a good man.  I respectfully ask for

5   your leniency in sentencing."

6        Max Khorasani (phonetic), another investor and

7   personal and professional relationship asks the Court for a

8   sentence that allows Andrew to continue making amends,

9   contribute positively to his community, and be present for his

10  family.

11       There is a letter from David Rottenberg (phonetic),

12  who submitted -- who invested millions.  Says, "I'm a" --

13  he's -- he says he endured an extremely large, large financial

14  loss, which we're not -- certainly not disputing at all.  And

15  he says, "I am a believer that good people make mistakes, that

16  if somebody fails, it is not absolute proof of rotten

17  character."  He says, "Perhaps even more so now, I'm certain

18  that this was an aberration on Andrew's part that will not

19  happen again.  I'm still hurt, yet I appeal to you for

20  leniency."

21       There's a letter from Alexander Ganem, who was a

22  contractor -- Andrew's contractor, worked on his house.  And he

23  says, "Andrew was only trying to have his friends and family

24  get ahead financially.  I truly believe he had our best

25  interest at heart.  I know he would love a second chance at

1   making things right.  He deserves to have that chance."

2           There's a letter from Geraldine and Cindy Panu, who

3   lost a substantial amount of money.  They also lost money in

4   another Bitwise loan unrelated to Andrew.  They say, "We

5   believe Andrew is patently remorseful and sincerely accepting

6   of his actions in this matter and therefore deserving maximum

7   leniency for purposes of his incarceration."

8           These are -- again, these are people who lost money.

9   In fact, they say, "If Andrew were to avoid all incarceration,

10  we would like to know the Court that we would welcome it," even

11  though the impact, as they say, of Andrew's actions on their

12  family have been significant.  They strongly and unequivocally

13  request that Andrew returned to his family quickly, expediently

14  begin his rehabilitation and start working hard for his and our

15  future.

16          Finally, there's one from Bobby Sharma, another

17  investor who says, "In light of Andrew becoming a recent father

18  and having demonstrated remorse, I urge the Court to show some

19  mercy.  People are human and nobody is perfect."

20          So I think this is a -- I think this -- I've never

21  seen any outpouring of support like that from people who lost

22  money in investment.  I do think that this is an extraordinary

23  young man before Your Honor who has made a mistake, and I think

24  even the best among us can make serious, serious mistakes.  I

25  also feel that not everyone who does so has to be placed beyond

1   a point where they can never recover their lives or make amends

2   or hold together their families or go on to be productive

3   people who can contribute to society with dignity.

4          Again, there are other things about the case that are

5   complicating factors.  I think there are serious legal issues,

6   causation issues.  I hope that the Court did not take my

7   advocacy about those legal issues to be anything other than

8   that, and not an argument that Andrew somehow was not

9   criminally responsible for what he has pled guilty to.

10          So the Court has those issues before it.  And in our

11  argument, in our sentencing memo, of course, we thought that if

12  the Court used a proxy calculation under the guidelines, the

13  appropriate approach would be the offense level that was --

14  that was Offense Level 16, 21 to 27, rather than 41 to 51.  I

15  would just say this -- and we did -- we asked the Court that

16  even if that was the starting point there -- we thought a

17  downward variance would be something that the Court should be

18  considering seriously.

19          First of all, I, as sure as I'm standing here, I

20  believe Mr. Adler is never going to offend again.  He's no

21  threat to society.  I think his letters show quite the

22  opposite.  He has a support network around him.  Many of his

23  friends and family and supporters have traveled to Fresno from

24  the east coast.

25          So he's not a threat.  And I understand the

1   Government's insistent on sending a message and so on.  But

2   really, I think it's just a question now of sentence of

3   incarceration is just punishment if Andrew is not a threat.

4   And the question is how much punishment should the Court be

5   thinking about?  And we don't believe -- and -- that none is

6   appropriate.  We understand the gravity of the circumstances as

7   Andrew does, but we certainly would like the Court to consider

8   that range of 21 to 27, even if we didn't get there by

9   convincing the Court of the loss calculation argument.  And you

10  know, we could even see a case and think a case would be

11  appropriate if you're at, you know, if you're at the low end of

12  that 21, it's not a short -- it's a short drop down to 18 and

13  something like 12 to 18, which is in Zone C.  And the split

14  sentence range is where if Andrew got 18, he could do nine in

15  and nine in a halfway house or whatever.  We think that that

16  sort of sentence, not the one that the Government is asking

17  for, would be the fair and just sentence for Mr. Adler in this

18  case.  Thank you, Your Honor.

19          THE COURT:  Mr. Illovsky, do you have comments about

20  the requested money judgment that was presented to the Court,

21  the request for entry of the money judgment?

22          MR. ILLOVSKY:  No, Your Honor.  I mean, that just --

23  that's going to follow from how the Court rules on all the

24  other stuff.

25          THE COURT:  I'm not sure I understand what you said.

1  I think in the plea agreement there was an agreement that the

2  Court would enter a money judgment.

3          MR. ILLOVSKY:  Yeah.

4          THE COURT:  Is there any disagreement as to that?

5          MR. ILLOVSKY:  I don't think so.  No, I don't think

6  so.

7          THE COURT:  All right.  Mr. Barton, any additional

8  comments?

9          MR. BARTON:  Yes, Your Honor.  Just as to

10 restitution, if I -- as I read one of the plea agreement,

11 18 U.S.C., Mr. Adler agrees in the plea agreement, quote, "That

12 he will pay the full amount of restitution as to victims

13 affected by his offenses as the Court may determine pursuant to

14 the procedures in 18 U.S.C. 3664."  As I read 3664, subsection

15 H in particular, saying if more than one defendant has caused a

16 loss, the Court may order restitution as to multiple

17 defendants.  I don't believe that -- unless I'm missing

18 something there, I don't know if that ties in just to

19 co-conspirators, but that's what defense counsel is relying on.

20 I believe you can.  And in the spirit of 18 U.S.C. 3664,

21 restitution should be awarded against all responsible

22 defendants regardless of whether or not they're proceeding in

23 different cases to the extent they're related.

24          And I believe that -- but I'll caveat saying

25 obviously the Court has great discretion in how it awards

1   restitution.  If it believes that the restitution order against

2   Mr. Soberal and Olguin is sufficient to ensure that

3   restitution, it can factor that into its analysis of what, if

4   any, restitution Mr. Adler may owe.

5          THE COURT:  All right.  Anything else, Mr. Barton?

6          MR. BARTON:  No, Your Honor.

7          THE COURT:  Mr. Adler, I did read your letter.  In

8   fact, I read all of the letters.  I spent a lot of time on this

9   case and all the letters that were also highlighted by your

10  counsel.  I know you were afraid you might not be prepared to

11  speak today, but I want to give you this opportunity to make

12  whatever comment you'd like before I impose sentence in your

13  case.

14         MR. ILLOVSKY:  I think Mr. Adler is okay.  I think

15  his letter describes for the Court what Mr. Adler wanted to

16  say.

17         THE COURT:  Mr. Adler, you don't wish to speak at

18  this time.  Is that right?

19         Can you put the microphone over to him, Mr. Illovsky,

20  even if it is just to say he doesn't wish to speak.  I do need

21  to hear that from him.

22         MR. ILLOVSKY:  Yeah, yeah, yeah.

23         MR. ADLER:  Your Honor, thank you for giving me the

24  opportunity to speak today.  The first thing I want to say is

25  that I'm incredibly humiliated and remorseful for my actions.

1    I stand here before you today not to excuse what I did, but to

2    fully and unequivocally accept responsibility for the personal

3    and professional choices that led me here.

4            This is the first step I need to take in order to

5    rebuild my life with integrity.  I misrepresented and lied to

6    participants about the interest rate.  This is what I pleaded

7    guilty to.  As a result of my lie and misrepresentation, I

8    harmed my closest business associates, many of whom are friends

9    and family of years.  I harmed my friends.  I harmed my family,

10   including my loving wife, Bo, and -- and my nine-month-old

11   daughter, Amelie, who both rely on me to be there for them

12   emotionally, financially, and physically.

13           I betrayed the trust of those who believed in me both

14   personally and professionally, who expected I would act with

15   integrity.  I failed them, and I carry the weight of that

16   betrayal every day.  By misrepresenting and lying to

17   participants about the interest rate, I made a mistake.  A

18   mistake I'll have to live with for the rest of my life.

19           I was raised in a stable family, received a great

20   education, and built a successful career supported by numerous

21   people who believed in me.  Many of those people participated

22   in the loan to Bitwise.  Many of those people are here today.

23   Regardless of my strong foundations, none of that prevented me

24   from crossing the line that I can never uncross.  I did not act

25   out of loyalty.  That was a moral failure, not just a legal

1  | one.

2  |       Becoming a father during this period has only

3  | deepened my understanding of accountability.  My daughter

4  | deserves a father who lives by example.  I cannot undo the

5  | past, but I can make every decision going forward to reflect a

6  | commitment to honesty, to service, and to rebuilding trust.

7  | This experience has been profoundly difficult, not only for me,

8  | but also for my wife and my daughter, Amelie.  A time that

9  | should be filled with joy as new parents has been clouded by

10 | uncertainty and stress, all of my doing.

11 |       I've been crippled by anxiety and fear for over a

12 | year about how my actions will impact not only the outcome of

13 | my life, but also the profound and lasting impact on the life

14 | and development of my daughter, the life and well-being of Bo,

15 | and the stability of our young family.  The thought of missing

16 | my daughter's milestones, her first steps, her first words, her

17 | first day of preschool is soul-crushing.

18 |       I understand that I'm no different before the law,

19 | and I don't have to be treated as if I am.  I'm respectfully

20 | pleading for your consideration and mercy in my sentencing so

21 | that I may make amends to those who've been harmed, support my

22 | family, and be actively present in my daughter's life.  I only

23 | ask that the punishment be no greater than necessary.  I ask

24 | not to avoid consequences, but so I can better fulfill my

25 | obligations to those who've been affected.  It requires that I

1  rebuild myself into someone worthy of trust, worthy of

2  forgiveness.  That work has already begun, and it will not

3  stop.  All right.

4          THE COURT:  All right.  Thank you, Mr. Adler.  First,

5  as pointed out by the Government and yourself, Mr. Adler, you

6  did have a good childhood.  You had every advantage.  And I

7  think it's not correct to say that you're motivated by greed.

8  I think the way you described is what also -- it speaks to me

9  that you were motivated by ambition.  You were motivated to be

10 a success, to impress yourself, the people who believed in you,

11 and I think in large part because you were influenced by

12 Mr. Hardcastle and the respect that he showed you as a mentor

13 but also as an equal.  I think all of these things spoke to you

14 and encouraged you toward this path.

15         What's difficult about the situation, though, is not

16 just that you kept back information from people who needed it,

17 but that you did it in a way that was really designed to keep

18 them from the information.  By forging Mr. Soberal's signature,

19 that was so far across the line that it's hard to contemplate

20 how you got yourself there.

21         The difficulty in this case, too, is that what I keep

22 hearing is that you just didn't want these people to try to

23 come back and take part of what you were going to earn on this.

24 These were people, as I understood it, people who trusted you,

25 people you trusted, your friends, your family members, and then

 1  the people who trusted those friends and family members.  And
 2  so that's what's difficult for me to square, that you thought
 3  that they wouldn't have felt that you were entitled to make
 4  money on this deal.  I don't think they would have thought
 5  that.
 6           I think -- the fact that you're saying this, I just
 7  don't believe it.  I don't think that's how you treat people
 8  that you care about, and I don't think that's how they would
 9  have treated you, especially when I consider you have people
10  walking away from millions of dollars and saying, we don't
11  think it's Andrew's fault.  And it is your fault.  The fact
12  that they say now, yeah, I would have taken this loan, I would
13  have given this money, even though had I known these facts, I
14  would have done the same.  I think in a lot of ways, this just
15  speaks to how much they care for you because there are very few
16  people who are willing to walk away from that amount of money,
17  but for the fact that they cared for you.  If you were a
18  stranger to them, I don't think they'd be saying the same
19  things.
20           Even still, obviously, that is not an issue you're
21  being held accountable for here.  No one is seeking to impose
22  that on you.  But it does concern me also that this issue of
23  the reserve, I agree, Mr. Illovsky is absolutely correct on
24  that.  But I also think, as I said, it speaks to the bigger
25  picture of what was happening.  You were in a situation where

1    you were flying high, you were at the pinnacle, you had never

2    been higher in your career at that point, and you wanted to

3    succeed so badly that you stopped -- or you failed to stop

4    yourself and just to think, and you're a smart person, so that

5    causes me concern.

6            I appreciate your remorse.  I have no doubt that when

7    you are beyond this, that you will not do something like this

8    again.  I have no doubt of that.  But if you were to stay in

9    this session later today, you're going to hear me sentence many

10   more people who are going to be equally as remorseful, who are

11   going to miss milestones with their children, with their wives.

12   They're going to miss Christmases and birthdays.  They're going

13   to miss all of those things too.

14           And you're right when you say you are not different.

15   I think that is a hard fact that is probably the most

16   humiliating for you to understand that when someone comes in

17   here and I sentence them for dealing drugs, you're not

18   different from them.  They made a mistake; you made a mistake.

19   And in fact, you will be held less accountable.  You will --

20   you are facing a much less sentence than someone who does that

21   kind of conduct.  So that's just the way the law is set up and

22   I can't do anything about that.

23           But when I consider what happened here, it isn't

24   simply about are you super sorry, I know you are.  It isn't

25   about whether the people forgive you, I know they do.  It's

1    about -- this is a very serious thing that you did, and you did

2    it without concern for what the law required of you, without

3    concern for those moral obligations that you talked about, and

4    without respect for the consequences of those decisions.  And

5    it is not infrequent that people come in here at this point

6    where the consequences are pressing on them when they want to

7    say to me, judge, save me from this.  The consequences as you

8    will teach your child going forward must be in your mind at the

9    time you do the acts.

10          And I appreciate you're a young person, and so maybe

11    those consequences weren't at the forefront, but they have to

12    be, especially when you put yourself up as, you know, this

13    person who is more knowing than others, who's going to

14    encourage people to invest money.  You had to be bigger than

15    them at that point, and you weren't.

16          I also have to, as Mr. Barton has pointed out,

17    promote respect for the law, not just by you, but by others.

18    You did not respect the law at the time when you should have.

19    I have to impose just punishment, and that does also concern

20    not only what you did, the consequences for the victims, but

21    also your remorse and your willingness to be different in the

22    future.

23          And then finally, I have to deter criminal conduct.

24    In this case, I think you and what you face so far is probably

25    adequate deterrence for you, but as what Mr. Barton is saying,

1    I can't have people coming in here saying, well, if you rip off

2    people for $4 million, $20 million, that is a better thing to

3    do than to go and, you know, I guess it is as simple as, you

4    know, sell a pound of methamphetamine.  That penalty is much

5    greater than what you're facing.  But I have to have people

6    understand, when you do what -- when they do what you do, they

7    can't come in here and think you're going to get probation,

8    because what you did does not justify that.

9            And as much as every time I impose a criminal

10   sentence on somebody that includes incarceration, it's the

11   people around them who suffer.  You're going to get through

12   this.  And as horrible and as scary as it sounds right now,

13   you're going to get through this.  But they're going to have to

14   pick up the pieces.  And I know you weren't thinking about them

15   when you did what you did.  But there is always a ripple.

16   You're just simply the stone that fell in, and all of those

17   waves are all of these people are going to have to suffer as a

18   result.  I know that there is never -- there is no point in

19   your childhood that you would have ever imagined yourself in

20   this seat.  And I think none of your family or friends would

21   have ever imagined you here either.  And in some ways, that's

22   why you are here, because they had faith in you.

23           In considering all of these factors, though, the

24   sentence recommended of 41 months is appropriate in this case.

25   The conduct at issue and all of the reasons I set forth support

1  that sentence.  And that is, I think, a reasonable and

2  sufficient sentence.  I don't think it's more -- greater than

3  necessary to comply with the purposes stated at 18 U.S.C.

4  Section 3553(a).

5          Pursuant to the Sentencing Reform Act of 1984, it is

6  the judgment of the Court that the defendant, Andrew Adler, is

7  hereby committed to the custody of the Bureau of Prisons to be

8  in prison for a term of 41 months.  You must pay a special

9  assessment of $100 with payment to begin immediately.  I find

10 you do not have the ability to pay a fine and imposition of a

11 fine is waived.

12         It is further ordered that Mr. Adler shall pay

13 restitution to the victims in the amount of $9,399,999 as

14 outlined in the restitution attachment to the pre-sentence

15 report with payment to begin immediately.  Interest on that

16 amount is waived.  Restitution is to be sent to the clerk of

17 the Court who shall forward it to the victims.

18         In addition, the Court gives notice that this case

19 involves other defendants who may -- or may involve other

20 defendants who may be held jointly and severally liable for

21 payment of all or part of the restitution ordered herein and

22 may order such payment in the future.  Such future orders do

23 not increase the amount of restitution ordered against the

24 defendant.

25         If incarcerated, any unpaid criminal monetary penalty

1    in this case is due during imprisonment at a rate of 10 percent

2    of the defendant's gross income per month or $25 per quarter,

3    whichever is greater.  Payment shall be made through the Bureau

4    of Prisons Inmate Financial Responsibility Program.

5         Upon release from imprisonment, you will be placed on

6    supervised release for a term of 24 months.  Within 72 hours of

7    release from the custody of the Bureau of Prisons, you must

8    report in person to the probation office in the district to

9    which you are released.  While on supervised release, you must

10   not commit another federal, state, or local crime, and you

11   shall not illegally possess controlled substances.  You must

12   make restitution in accordance with 18 U.S.C. Section 3663 and

13   3663(a), or any other statute authorizing a sentence of

14   restitution.

15        You must cooperate in the collection of DNA as

16   directed by the probation officer and shall comply with the

17   standard conditions which have been recommended by the United

18   States Sentencing Commission, and which are adopted by this

19   Court.  The mandatory drug testing condition is suspended based

20   upon the Court's determination that Mr. Adler poses a low risk

21   of future substance abuse.

22        I adopt the special conditions recommended by the

23   probation officer in the Sentencing Recommendation Report, and

24   I impose all those listed as special conditions.

25        As to the question of a preferred location of

```
1   incarceration, what I've been told so far is an institution in

2   Connecticut.  Is there anything more specific?

3               MR. ILLOVSKY:  Your Honor, we'd ask for a designation

4   to the camp at Lewisburg.  That's in Pennsylvania.  It's got

5   a -- and there's an RDAP program that Andrew is --

6               THE CLERK:  Counsel.  Counsel, microphone.

7               MR. ILLOVSKY:  Sorry.  Did you hear the first one?

8   Okay.  Sorry.

9               Your Honor, we'd ask that the Court designate

10  Mr. Adler to report to the camp at Lewisburg.  It's in

11  Pennsylvania.  It has an RDAP program.  I know that Mr. Adler

12  is contemplating trying to be qualified for that as well.  With

13  respect to self-surrender --

14              THE COURT:  Can we wait on that just one moment?  Let

15  me order.

16              I will recommend that Mr. Adler be incarcerated at

17  the institution located in Lewisburg, Pennsylvania, but only

18  insofar as this recommendation, of course, is security

19  classification and space availability.

20              As to appeal, Mr. Adler, you did waive your right to

21  appeal and to collaterally attack any part of your plea and

22  sentence in this case.  There are consequences set forth in

23  your plea agreement for doing so.  However, you will want to

24  consult your attorney or do your own independent legal research

25  before deciding whether you should file a notice of appeal.  I
```

1  don't have an opinion on that one way or the other.  And in

2  fact, those consequences are in limited circumstances that you

3  will want to investigate.  However, you are advised that if you

4  wish to appeal from the sentence I've just imposed, you must

5  file a written notice of appeal within 14 days of today's date.

6  If you cannot afford an attorney in connection with the

7  prosecution of that appeal, I will appoint one for you.

8            As to the question of voluntary surrender,

9  Mr. Illovsky, you started to say?

10           MR. ILLOVSKY:  I've spoken with the Government and

11  about extending the time.  Andrew has a wedding for his sister-

12  in-law that he is to officiate.  I told the Government the

13  wedding is in mid- to late September.  I told the Government

14  about this.  They have no objection.  We'd ask for a surrender

15  date of September 30th, if we may.

16           THE COURT:  Mr. Barton?

17           MR. BARTON:  It's fine with the Government, Your

18  Honor.

19           THE COURT:  At this point, I do find that there is

20  clear and convincing evidence that Mr. Adler is unlikely to

21  flee and at this point not likely to pose a danger to the

22  safety of any person or the community.  I will grant voluntary

23  surrender to September -- well, let me -- September 30th.

24           As further ordered that the defendant, having been

25  sentenced to the custody of the Bureau of Prisons, shall

1  surrender to the institution designated by the Bureau of

2  Prisons, or if no such institution has been designated, to the

3  United States Marshal at New Haven, Connecticut before 12 noon

4  on June 30th, 2025.

5          Mr. Adler, you are advised that it is a criminal

6  offense punishable by a consecutive term of imprisonment to

7  fail to surrender for service of sentence pursuant to the order

8  of this Court.  All conditions of pretrial release remain in

9  effect until Mr. Adler surrenders in accordance with this

10  order.

11          Before you leave the building today, sir, you are

12  ordered to report to the third floor to the pretrial services

13  agency to receive additional instructions.

14          All right.  Anything else then, or any other

15  objections?

16          MR. BARTON:  As to the order of forfeiture, Your

17  Honor, if the Court could adopt that.

18          THE COURT:  You're asking me to make final the

19  preliminary?

20          I will make final the preliminary order of forfeiture

21  as to this defendant.

22          Anything else, Mr. Barton?

23          MR. BARTON:  No, Your Honor.  Thank you.

24          THE COURT:  Anything else, Mr. Illovsky, or any other

25  objections?

```
1              MR. ILLOVSKY:  No, Your Honor.

2              THE COURT:  All right.  Thank you.  Good luck,

3    Mr. Adler.

4              MS. PASCUAL:  Your Honor?

5              THE COURT:  Probation.

6              MS. PASCUAL:  Yes.  Is the restitution going to be

7    joint and several with Jake Soberal and Irma Olguin, Jr.?

8              THE COURT:  Yes.

9              MR. BARTON:  Yes.

10             THE COURT:  Anything else then?

11             MR. BARTON:  No, Your Honor.

12             THE COURT:  All right.  Thank you.

13        (Proceedings concluded at 9:34 a.m.)

14                         *  *  *  *  *

15                   C E R T I F I C A T I O N

16

17        I, Alicia Jarrett, court-approved transcriber, hereby

18   certify that the foregoing is a correct transcript from the

19   official electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428    DATE: June 9, 2025

25   ACCESS TRANSCRIPTS, LLC
```